Case number 175496, United States of America v. Joshua Ewing. Oral argument not to exceed 15 minutes per side. Mr. Avalano for the appellant. May it please the court. Opposing counsel, Andrew Avalano on behalf of the appellant. I believe the case here is a case of identity. We have a phone, a cell phone that was used to send a text to the decedent indicating a possible drug transaction. We don't know who was using that phone. I think that's the crux of the case. We don't have the identity of the person who was using the phone. This court has ruled in the U.S. v. Lowe back in 2010 in a child pornography case that a laptop that was in the house of the defendant, it had the defendant's name on it, it had been used to download child pornography. The court ruled that because there were other individuals who had access to that laptop, we couldn't say that the defendant was the one who downloaded the child pornography. In this case, we have the same basic set of facts. Is there a difference between a phone that is carried on a person and a laptop that's accessible in, say, an apartment? I think that they're both electronic devices. Cell phones, their nature has changed as well as laptops, I guess, and iPads, things like that. They're all pretty transportable. I think, ultimately, it probably doesn't make a difference. Well, the phone in question was owned by Josh. You and yes, uh-huh. So, and there's contact information in the deceased phone indicating Josh is his contact. Correct. And so I'm, I suppose, failing to see how that's insufficient to permit the inference beyond a reasonable doubt that the defendant and the decedent were communicating with each other. Right. This is along the lines of the hit-and-run car accident. We have an identified piece of property, a car in the example, but we don't know who was driving the car. Until we know who was driving the car, we can't say that the owner of the car was responsible for the hit-and-run. That's the situation. No one saw appellant using his phone that night. We don't even know where the phone was. There was no cell tower location data presented by the government. But isn't that, then, a question for the jury? And if, in your argument, assume, say, appears to me to rely on a determination that a jury could not draw as a reasonable inference from that testimony, that there was communication between Ewing and Deaton. Correct. But they did. What is your best case to show that that is, that's not a proper inference that is within the jury's prerogative to draw? If I understand your question correctly, the government has the burden to show that the appellant was using his phone, not the other way around. So... You know, what do you think the probabilities are that someone other than the owner of a phone is using it to speak to someone who is in the phone as a contact? I mean, if someone were using my phone, which I don't know that anybody but me has ever used it, they'd be talking to whoever they needed to talk to, presumably. Not to my contacts. Right. These were text messages. These are young people. They have different habits than perhaps we do in sharing devices. I dare say all of us text. Yeah. Was there, is there anything in the record as to whether or not a password was necessary to use the phone? No, there's nothing in the record regarding that. I'm just struggling with where we are in this case. This was a jury determination. Correct. Your argument requires that we hold that the failure to establish that someone saw Ewing, Josh Ewing, use his own telephone to call this as a matter of law, that is insufficient evidence to take the case to the jury. Correct. So I'm asking you, do you have any cases that would support that? Yes, and that is the Lowe case. Because the... Oh, I'm sorry. Remind me of the fact. The Lowe, U.S. versus Lowe, that's the child pornography case with the laptop. Okay, so it is not about telephones. It's, it's the computer case. Right. That's the computer case. Correct. Correct. The jury should not be allowed to guess that Josh was using his phone that night. And this is just the first hurdle that the government has to, to get across, is who was using the phone. Again, back to that car analogy. You know, I don't let anybody drive my car, but somebody might drive my car. And if my car is, is proven to run somebody over, the government has to prove that I was driving before I can be convicted for vehicular homicide. So, it's, it's, it's a frustrating point, to be sure, but one that is, I think, very clear, unless they, unless they... I'm not sure how, how great that analogy really is, given the realities of cell phone usage today, and the extent to which cell phone users consider the phones, not as some fungible thing they hand around, but as something that is really important to their functioning, on a pretty constant basis. I, I think that the analogy does hold. If you go back to when people started driving cars, they were very personal. Not everybody knew how to drive one. But again, the government still would have had to have proven that the person operating, that the, that the owner of the car was actually operating the car, if they ran somebody over on the road. Well, it's not... There is evidence here that goes beyond the mere fact that Mr. Deaton died from drugs. And evidence that links your client to the transaction. You just are saying it's insufficient. There's, I'm not sure I understand your question, Judge. If you find a car, and there's been an accident, you do have to go back. There'd have to be additional proof. But if you have evidence, for example, that the owner of the car left a particular location with the car, I mean, it wouldn't take... Oh, sure. Sure, it wouldn't take much. It wouldn't take much more to get to a permissible inference that the owner was driving the car on the occasion of the accident. Agreed. Here, we don't just have the fact of an accident. We have the, you know, the ownership of the phone, Mr. Deaton's tie to the phone on the other end, the presence of a contact, Josh. Your client's name is Joshua Ewing. Sure, sure, absolutely. I mean, we have a good deal more. And we have the communication between Josh and the Deaton phone, and we have the content of the messages. Right. We have the communication between a phone owned by Josh and Mr. Deaton. And I think that the Lowe case is instructive here as it relates to that ownership. There was no question that Lowe owned that laptop, but it was accessible to other individuals. And ultimately, the burden here, we have a young man who had one prior conviction for using heroin, was a drug addict himself, and is now looking at spending the rest of his life in prison. I think that there should be more evidence required that he was involved in this transaction. Now, that's not the kind of concept reasonable doubt is. That's not the concept of sufficiency of the evidence. No, I understand. It doesn't have to be more because your client is young, because your client had one prior drug conviction, and because he's spending the rest of his life in prison. It's the same. I mean, that's the system. Sure, I understand. I do. I do. It's not my argument that there's additional evidence that's required. I'm just trying to impart upon the court the import of what we're facing here. Well, let's assume that he did sell the drugs. Are you arguing that there is insufficient evidence of causation of the particular drugs, assuming they were sold? Yes. What's your argument there? Yes. I'm running out of time, but I'll go ahead and answer. He was indicted for selling heroin and fentanyl, which caused a death. The coroner, the state of Kentucky, determined that the cause of death was an acute combination of cocaine and fentanyl. So, heroin wasn't even mentioned. We don't know where the fentanyl came from, necessarily. It is commonly mixed with heroin, but not always. And we don't know if what was sold that night was the stash that caused the death. So, because the government indicted for heroin and fentanyl, and not cocaine and fentanyl, under Burrage, we've got a problem. Well, it really then turns to the legal question of what proof is sufficient in an analysis of the various cases. Correct. I see I'm out of time. Thank you. May it please the Court, I'd like to start off with this identity issue, if I can. And I'd like to point you to the Rule 29 motion that is being appealed here. That's Record 39, Page ID 123, third paragraph. They concede this point, that Joshua Ewing sold the drugs that night, that there is no identity issue. Council would, for purposes of reiteration, acknowledge that the facts appear to be that someone in the late evening hours of February 7th, a drug transaction transpired between the defendant and decedent at the initiation of the decedent. So, that part of issue number one has been conceded. Now, we can talk about the facts in the record, and that's the way we did things on the brief. We didn't rest on this concession, but I did want to point that out. Has Mr. Ewing been represented by the same council throughout? I don't know that it makes a difference. That was just curiosity, as opposed to... I think it makes a difference from a post, from a collateral perspective, and it is a different lawyer. As to the US v. Lowe case that's cited on defendant or appellant's brief, Page 25, that's a different fact set. There, the government proved, and I haven't read the trial record, but according to the appellate opinion, the government proved that pornography was downloaded using a certain computer. And according to the appellate record, the government did not put on proof that there was one particular person, the defendant, who had downloaded that. And the facts were that there were three people living in the home, and that it seemed like all of them had access to the computer. So, that's a different set of facts than what we have here. Here we have, for identity, we have the text messages to a contact in the victim's phone named Josh. Let's assume that that was sufficient to get to the jury. Then the question becomes, is there sufficient evidence that Ewing sold Deaton the drugs that killed him? And it seems to me that there's some real issue with the toxicology report. In that report, there is no heroin or heroin metabolites. The proof and the basis of the indictment and the proof was that Ewing sold heroin laced with fentanyl. And that the fentanyl caused his death, but that there were no heroin or metabolites in his blood, which would seem to indicate that that was not the conveyor of the fentanyl that killed him. And there's a time gap there, isn't there? There was a sale in the evening, which the argument of your opposing counsel is that people who buy drugs buy them to use them right then. And then what was found when he was found the next morning, what was found in his blood was cocaine and fentanyl, either of which I think the proper wording on that report was sufficient to have killed him. Putting Burridge aside, how have you shown a connection between the sale of heroin laced with fentanyl to a death that does not show any evidence of heroin? I'm going to try to answer all of those questions. Sorry. I'm trying to get out. Do we have the whole scenario on the table? Because that's what I want you to answer. I think I don't agree with all of this facts, but if I correct me where I'm wrong, if I don't answer one of them, remind me. The time of the transaction was around 1130 or 1140 at night, according to the testimony of Detective Grohl. He was found, according to the defibrillator report, he was dead around 8 a.m. the next morning in his blood. And I just want to try to clarify this. What was found was not cocaine. There was no cocaine found in his blood. Metabolites from cocaine. And the testimony of the toxicologist for the government ward was that means that the cocaine would have been ingested at least eight hours prior. But there are no heroin metabolites or heroin. If fentanyl was in the blood as present and the conveyor of that fentanyl was heroin, wouldn't you have to have had both? I don't remember the record on the point of whether the heroin was in the blood or not. No, it said it wasn't. I'm sorry, it wasn't? What if it wasn't? I mean, that to a lay person, that seems like it might be pretty significant. And I kept looking for the medical explanation for that, and it hasn't been called to my attention. And in fact, I'm looking at Mr. Ewing's counsel's brief, and it says Dr. Fiola testified that because there was no heroin or its metabolite found in Deaton's blood, it likely was not ingested around the time of his death. So I think if I'd been the prosecutor, I'd have wanted to try to establish things like how long it would remain. You know, just how one could, how you could take heroin combined with fentanyl and have cocaine be what was found at the end, rather than heroin. I don't remember an affirmative finding that there was. I'm just telling you what he says in his brief. Right. You don't think that that's in the record? I don't, I don't, I've read the record, and I don't recall an affirmative statement that there was no heroin in the blood. What was talked about, what was there, was the fentanyl. And that, it was, that was, that was what was seen as the, as the but-for cause of his death. It's reiterated several times. I can't remember whether I read the medical report or not. It was the toxicology report. And my understanding is that Ewing's expert was not contradicted at trial and testified that the lack of heroin metabolites in his blood makes it unlikely that he used heroin in the hours leading up to his death. That's the testimony. So how do you make the connecting evidentiary requirement that it was the heroin, which you charged? I mean, that's the key. You could have charged something different, but you charged heroin and fentanyl. And so the question becomes, if there's no heroin there, how have you made the connection to show that it was that sale of drugs that caused his death? Well, I think I would point to the Fiola record, Fiola testimony. It's record 66, page 500. He concedes that the fentanyl in the bloodstream was at a lethal level. It's at the bottom of the page. Exactly. Right. But you could have gotten the fentanyl from somewhere else. Well, the testimony, and that's another part of issue number one that you got into. It's not just that the fentanyl killed him, but that Josh Ewing sold the fentanyl. And the testimony there is his heroin and fentanyl mix. And his statement is that he sold heroin laced with fentanyl. That's right. And that you say, I'm indicting you for that, I'm proving that you did it, and that caused his death. Well, then when you get to the place of your evidentiary burden in which the toxicology report shows that there was not heroin nor heroin metabolites in the blood, then the conclusion of the opposing expert is it wasn't that drug. That was not the cause of death. And so where did the fentanyl come from? That's your burden. Well, I'd like to explain the facts for how the government proved that at trial. The text message string shows a sale of a gram of something, a G of something, according to Detective Rall's testimony for $170, which Detective Rall testified was the price of heroin, $150 to $200 per gram. And then I just want to get to the next point. He was found in his garage with a syringe between his feet and his arm sleeve pulled up next to a spoon with a heroin and fentanyl residue on it. That's in the record. Was it a heroin and fentanyl or was it a fentanyl residue? Heroin and fentanyl residue. That's record 66, page 433. That's the chemist Robinson testified that the sputum had a heroin and fentanyl residue on it. So help me understand if that was the immediate cause of death. Why the toxicology report says there's no heroin and no heroin metabolite in his blood. I think the metabolite would be if, so those are two separate things. Sure. The metabolite would be if it had been metabolized and here's what the residue of it is. So then there should have been pure heroin in his blood if that was what caused his death. I just, I don't, I didn't see anything in the record that indicated it wasn't there. But if it wasn't there, then I don't have an explanation for that. Heroin is mixed with fentanyl. That's how it's put into the body and the body had fentanyl in it. And we're not saying, as to this timing issue, the government didn't present a theory as to whether he took it all at midnight or whether he took it at 8 a.m. or whether he took it in multiple doses throughout that evening. You know, the defense brief talks about this quite a lot. I mean, it seems to me, you know, I can think of a number of responses. I mean, but it's not for me to devise arguments for the government. But is it necessary that you correctly prove what was mixed with the fentanyl if both are controlled substances? He was indicted for selling a mixture of heroin and fentanyl. He was found with a spoon next to him with a heroin and fentanyl residue. The pricing indicated heroin. Heroin and fentanyl, as the victim girl testified, are commonly mixed. So does that mean that the toxicology report is likely wrong? Or if it's right, does that cause some doubt over whether he actually ingested what had been, or, you know, took into his body what had been sold by Mr. Ewing? I think that's the speculation that the jury has to do. Here, there was no autopsy. There were tests run on the blood and the urine. I don't recall there being affirmative testimony of this sort. But if there was, then I think the jury has to decide who they're going to believe, whether they're going to believe the government's testimony that fentanyl killed this person and Fiola himself concedes that as well. The government testified that cocaine wasn't present in a lethal amount and Fiola testified that as well, that it was unlikely that cocaine would have caused this because it wasn't concentrated. That was the defendant's witness. I think that's the evidence that for Issue 1, the jury would have rested on. And the testimony that we've been talking about is found exactly where? The spoon had heroin and fentanyl residue on it. That's Exhibit 3A, Record 66, Page 433. Fentanyl was in the body in a fatal amount. That's Record 66, Page 450. That's Ward's testimony and Fiola testifies to it in Record 66, Page 500. The testimony that the cocaine was not present in a fatal quantity. That's Record 466, Page 451 and 452. Fiola testifies to it, Record 66, Page 497. Those would be some of the citations we would point you to. What's your best case for showing that it was adequate to your burden as a legal matter to charge and prove the sale of heroin laced with fentanyl and to prove that the death was from fentanyl and there was no heroin in the body? I don't know of a case that describes that exact fact set. Assuming there wasn't heroin in the body, assuming that was a correct and affirmative finding in the record.  What's your best legal argument for why that lack of heroin in the blood indicates that while the sale eight hours earlier may have entailed some usage, that it was other fentanyl or another sale of drugs from anybody else that caused Deaton's death since there was none of the heroin that you have proven Ewing sold in the body of the man who died? My argument against that theory would be that the jury found at trial that the fentanyl killed him and that the jury heard at trial that fentanyl would be mixed with heroin and that that's how it would be administered into the body. The spoon had heroin and fentanyl in it. That people don't just inject themselves with fentanyl straight, that the amount of drugs that was sold to Jeremy Deaton was either half a gram or one full gram, which is about five doses. That's what Detective Grohl testified. A dose of heroin is about one-tenth of a gram so that he would have taken this drugs over the course of the night. The Burridge and Volkman cases are the cases that we rely on for but for cause. And the testimony that the government presented at trial that the jury would have heard is that 16.8 nanograms per milliliter of fentanyl is lethal. This isn't a close case as described in Burridge and Volkman where the addition of the drug alone wasn't a lethal amount but in combination with everything else, it was the straw that broke the camel's back. Here the fentanyl, there's been no evidence of any other sale of anything, of any other... Not from this guy. Not from this guy. Not from Ewing. Well, the jury didn't hear an alternative defense theory as well. So if we're evaluating a Rule 29 motion and a Rule 29 ruling, this is the evidence, a rational fact finder could have found the elements beyond a reasonable doubt. Any questions about issue number two or issue number three? All right, thank you. There was not a search of the house after the body was found to determine if there was any leftover drugs. We don't know when the drugs were injected. The search was not conducted. Dr. Fiona said that cocaine certainly could have caused the death. And most importantly, the state of Kentucky determined the official cause of death was a combination, a toxic combination of cocaine and fentanyl. Fentanyl is now... That was presented in evidence? Yes, yes. Dr. McCarthy testified, page ID numbers 335 and 336, that it was an acute combination drug toxicity of cocaine and fentanyl. This question of whether the substance that killed him was the substance he obtained from Mr. Ewing, what part did that play in the trial? Well, I'm not sure that the government proved that. Well, did the defendant make this argument? Which argument? The argument that Judge Strach and I have been articulating on his behalf. I think that the defense did not put a witness on. There was no witness that was put on to say that there could have been another sale at another time from another dealer. However, there was evidence from Detective Grawl that there was another contact on the phone, a Pedro, that had been contacted, or tried to be contacted. There was no return text, but that Pedro was in fact a drug dealer. So we do have Pedro in the mix as a potential source of another amount of drugs. And again, it's depending on the amount of use that the person was used to, because there was testimony by the state's witness, but also by Dr. Fiona, that somebody who uses opiates a lot can build up quite a tolerance. So they can wind up using quite a lot at one point, and it would not be fatal to them, whereas it would be fatal to somebody who doesn't do it frequently. Again, getting back to Dr. McCarthy, he said that it's both cocaine and fentanyl. And at the time of his death, his heart was beating at 353 beats a minute. 80 is normal for most of us mortals who aren't triathletes. So that seems to indicate as well that cocaine was the triggering event. Mr. Ward, the toxicologist for the government, conceded that both cocaine and fentanyl were the contributing factors to the death. So that again supports the state of Kentucky's determination that it was cocaine mixed with fentanyl that caused the death. But there was no challenge to the toxicology report that showed neither heroin nor heroin metabolites in the blood. Is that correct? Correct. There was no challenge to that. It was pretty clear that I think all the experts testified that heroin metabolizes relatively quickly. Dr. Ward said, as far as the cocaine metabolite, that cocaine metabolizes so quickly that it's hard to tell how much and when. But the fact that his heart was beating at 353 beats a minute tends to lead us to the conclusion that he was doing cocaine at the time. So the presence of the cocaine is then not inconsistent with the fact that he took heroin laced with fentanyl earlier. It would just mean he then probably took some cocaine too along the way. Right, right. Okay. I think your time's up. It is. We thank both of you for your argument. We'll consider the case carefully. Mr. Avellano, we note that you have been appointed to represent Mr. Ewing under the Criminal Justice Act, and we are very appreciative of your having accepted that appointment and of your zealous and good representation of him today. Thank you so much.